## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**MARK L. PINKNEY,**

      **Plaintiff,**

**vs.**                       **Case No.  1:15cv155-MP/CAS**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social**
**Security Administration,**

      **Defendant.**

_____/

## <u>REPORT AND RECOMMENDATION</u>

This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Acting Commissioner (Commissioner) of the Social Security Administration (SSA) denying Plaintiff's application for a period of disability and Disability Insurance Benefits (DIB) filed pursuant to Title II of the Social Security Act (Act).  After consideration of the entire record, it is recommended that the decision of the Commissioner be affirmed.

## I. Procedural History

On November 8, 2011, Plaintiff, Mark L. Pinkney, filed an application for DIB alleging disability beginning October 21, 2008, based on stenosis L4, L5, and S1 disc, pain, and depression.[1]  Tr. 29, 206-09, 222, 226. (Citations to the transcript/administrative record, ECF No. 10, shall be by the symbol "Tr." followed by a page number that appears in the lower right corner.)  Plaintiff's date last insured for DIB is December 31, 2011.  Tr. 29, 222.

Plaintiff's application was denied initially on March 22, 2012, and upon reconsideration on July 6, 2012.  Tr. 29,126-36, 141-54, 160, 169. On August 13, 2012, Plaintiff requested a hearing.  Tr. 29, 174.  On December 10, 2013, Administrative Law Judge (ALJ) Teresa L Hoskins Hart held a video hearing with Plaintiff in Gainesville, Florida, and the ALJ in San Jose, California.  Tr. 20, 83-125.  Plaintiff was represented by Elizabeth F. Stakenborg, an attorney.  Tr. 29, 74-82, 184-87.  Plaintiff testified during the hearing.  Tr. 20, 88-113.  Donna C. Mancini, an impartial vocational expert, testified telephonically during the hearing.  Tr. 29, 113-22.

---

[1]  Plaintiff states that he applied "for SSDI and SSI benefits," ECF No. 12 at 5, although it appears he only applied for DIB benefits.  *See* Tr. 222.

On January 30, 2014, the ALJ issued a decision and denied Plaintiff's application for benefits concluding that Plaintiff was not disabled from October 21, 2008, the alleged onset date, through December 31, 2011, the date last insured.  Tr. 29-41.  On March 24, 2014, Plaintiff's counsel filed a request for review and a memorandum in support of the request for review.  Tr. 19-25; Tr. 260-65 (Exhibit 11E).  On May 28, 2015, the Appeals Council considered the reasons Plaintiff disagreed with the ALJ's decision and denied Plaintiff's request for review of the ALJ's decision finding this information did not provide a basis for changing the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6; *see* 20 C.F.R. § 404.981.

On July 27, 2015, Plaintiff filed a Complaint with the United States District Court seeking review of the ALJ's decision.  ECF No. 1.  The parties filed memoranda of law, ECF Nos. 12 and 13, which have been considered.

## II.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1. "The claimant last met the insured status requirements of the Social Security Act on December 31, 2011."  Tr. 31.

2. "The claimant did not engage in substantial gainful activity during the period from his alleged onset date of October 21, 2008 through his date last insured of December 31, 2011." *Id.*

3. "Through the date last insured, the claimant had the following severe impairment: status post laminectomy and fusion at the lumbar spine with residual pain." *Id.* The ALJ considered several other impairments such as Plaintiff's obesity and mental impairments. Tr. 31-33. The ALJ determined that Plaintiff had mild limitation in activities of daily living, social functioning, and concentration, persistence, or pace and no episodes of decompensation that have been of extended duration. Tr. 34-35.

4. "Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." Tr. 35.

5. "[T]hrough the date last insured, the claimant had the residual functional capacity [RFC] to perform light work as defined in 20 CFR 404.1567(b) except that he was able to stand and walk for a total of four hours in an eight-hour workday. In addition, he must not have been required to remain sitting or standing for more than forty-five to sixty minutes at a time without an ability to change positions for at least a few minutes. The claimant was able to occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never able to climb ladders, ropes, or scaffolds. He needs to avoid concentrated exposure to extreme heat, extreme cold, vibration, and hazards." Tr. 35.

6. "Through the date last insured, the claimant was unable to perform any past relevant work," including work as a construction worker II-helper; warehouse worker; janitor; and handyman. Tr. 39.

7. The claimant was 38 years old, which is defined as a younger individual age 18-49, on the date last insured. *Id.*

8. "The claimant has a limited education and is able to communicate in English." *Id.*

9.  "Through the date last insured, considering the claimant's age, education, work experience, and [RFC], there are jobs that existed in significant numbers in the national economy that the claimant could have performed." *Id.* According to the ALJ,

> [t]he vocational expert testified that given all of these factors the individual would have been able to perform the requirements of representative occupations such as mail clerk (DOT# 209.687-026), light, SVP 2, with 8,963 jobs in Florida, and 244,956 jobs in the national economy); ticket taker (DOT# 344.667-010), light, SVP 2, with 1,062 jobs in Florida, and  23,742 jobs in the national economy; and ticket seller (DOT# 211.467-030), light, SVP 2, with 2,448 jobs in Florida, and 39,669 jobs in the national economy.  The representative occupations include a ticket taker, a housekeeping, cleaner, and a mail clerk.  These jobs are classified by the DOT as light, unskilled work, at a Specific Vocational Preparation (SVP) of 2.[2]

> The vocational expert testified that the following jobs would accommodate a need to change positions, as indicated in the claimant's residual functional capacity.  The vocational expert explained that her testimony is based upon her knowledge of the market place.  The vocational expert informed that the sit/stand option is not addressed by the Dictionary of Occupational Titles, and therefore, her testimony is not inconsistent with the Dictionary of Occupational Titles.

---

[2]  "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 404.1568(a).  A Specific Vocational Preparation (SVP) of 2 means "[a]nything beyond short demonstration up to and including 1 month."  Dictionary of Occupational Titles (DOT) (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP. "[SVP] is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  *Id.*  Unskilled work corresponds to an SVP of one and two.  Social Security Ruling (SSR) 00-4p, 2000 SSR LEXIS 8, at *8 (Dec. 4, 2000).  Further, unskilled work is work involving understanding, remembering, and carrying out simple instructions; making simple work-related decision; dealing with changes in a routine work setting; and responding appropriately to supervision, co-workers, and usual work situations.  SSR 85-15, 1985 SSR LEXIS 20, at *10-11 (1985).  In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

> Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.
>
> Based on the testimony of the vocational expert, the undersigned concludes that, through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

Tr. 40.

10.  "The claimant was not under a disability, as defined in the Social Security Act, from December 31, 2011, the date last insured."  Tr. 40.

## III.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002)

(citations omitted).  The court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision.  Moore, 405 F.3d at 1211.[3]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'"  Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national

---

[3] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).  In addition, an individual is entitled to DIB if he is under a disability prior to the expiration of his insured status.  *See* 42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[4]

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled. If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the

---

[4] An RFC is the most a claimant can still do despite limitations. 20 C.F.R. § 404.1545(a)(1). It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records. *Id.* The responsibility for determining claimant's RFC lies with the ALJ. 20 C.F.R. § 404.1546(c); *see* SSR 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) ("The term "*residual functional capacity assessment"* describes an adjudicator's finding about the ability of an individual to perform work-related activities. The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.").

national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.  The Evidence

Plaintiff did not provide a separate, complete statement of the material facts at issue in this case nor did he take issue with the ALJ's findings, only her conclusions.  ECF No. 12 at 2-15.

### A.  Plaintiff's Pre-Hearing Reports and Hearing Testimony

The ALJ considered Plaintiff's pre-hearing reports and hearing testimony at step two when determining whether Plaintiff had any severe impairments and at step four when determining Plaintiff's RFC.  Tr. 31-32 (step two determination); Tr. 36 (step four RFC determination); Tr. 38 (same); *see also* Tr. 88-113 (hearing testimony).

### B.  Consultant Reports

The ALJ considered numerous State agency consultant reports at step two, Tr. 32-34, and when determining Plaintiff's RFC at step four,

Tr. 37-39.  Plaintiff selectively refers to these reports, but does not provide a separate, complete statement of the reports.  ECF No. 12 at 2-15.  At step two, the ALJ assigned the weight she gave to each consultant's opinions and one treating, pain management specialist.  Tr. 33.

> The undersigned accords significant weight to the opinions of Dr. O'Neil, Dr. Wise, Dr. Sandrik, and Dr. Humphreys because the opinions are consistent with one another and with the medical record as a whole.  The undersigned accords some weight to the opinion of Dr. Schilling because the doctor has a valid basis for his opinion, as the record contains no treatment notes from a mental health professional and the record contains no objective evidence supporting the claimant's allegation that he has been receiving treatment for his depression.  However, the undersigned is giving the claimant the benefit of the doubt in finding, based upon the consultative examinations performed after the claimant's date last insured and based on his subjective complaints, that he likely did have a medically determinable mental impairment prior to the date last insured.  Hence, the undersigned is not adopting Dr. Schilling's opinion.  The undersigned accords little weight to the opinion and GAF score of Dr. Beaty because his opinion is based solely upon the claimant's responses to questioning, does not include the doctor's own objective observations or findings, and is inconsistent with the evidence and the other opinions of record.  The undersigned's assessment of the medical opinions is supported by the medical evidence.  First, the record does not contain any treatment notes from a mental health professional.  Second, although the claimant alleges receiving medication treatment for his depression from Youssef W. Wassef, M.D., his pain management specialist, Dr. Wassef informed that the medication was not provided to treat a mental impairment.[5] In fact, the claimant informed Dr. Wassef, on December 7, 2009, that he denied feeling depressed and he further reported that he had been managing his depression with meditation and prayer [Exhibit 4F38].  Also, Dr. Wassef filled out Supplemental Mental Impairment Questionnaires about the claimant on September 24, 2010 and again

---

5  *See infra* at n.8.

on February 9, 2012.  Dr. Wassef noted that he did not feel that the claimant suffered from a mental impairment that significantly interfered with daily functioning.  The doctor also informed that he had not prescribed any medication to the claimant for a mental impairment [Exhibits 11F1 and 13F].  Furthermore, the findings from the evaluations of Dr. Humphreys and Dr. Beaty do not support more than mild limitations on the basis of the claimant's mental impairments.  Dr. Humphreys noted that the claimant exhibited no involuntary movements.  The doctor observed that the claimant spoke spontaneously at a normal rate and tone.  The claimant denied suicidal and homicidal ideation, intent, and plan.  Dr. Humphreys found the claimant's thought processes to be logical and goal oriented and his thought content to be unremarkable. The doctor found the claimant's judgment and insight to be good for hypothetical situations.  The claimant was able to perform simple addition and multiplication [Exhibit 9F].  Dr. Beaty observed that the claimant drove himself to the interview, had good hygiene, and was casually and appropriately dressed.  The doctor noted that the claimant walked with a normal gait and had no involuntary movements.  Dr. Beaty found the claimant to be oriented.  The doctor found the claimant's thought processes to be intact and organized and his thought content to be devoid of delusions or paranoia and appropriate to topics discussed.  Dr. Beaty's testing of the claimant's attention and memory was generally unremarkable.  The doctor estimated the claimant's cognitive ability to be average [Exhibit 17F].

Tr. 33.  The ALJ also briefly referred to Dr. Beaty's consultative,

examination report when she considered Plaintiff's social functioning and

concentration, persistence, or pace determinations.  Tr. 34.  The ALJ

considered Dr. Greenberg's consultative, examination report when

assessing Plaintiff's RFC.  Tr. 37.

Robert A. Greenberg, M.D., State agency consultant, examined the claimant on March 14, 2012.  Dr. Greenberg noted that the claimant had lumbar pain during range of motion of the lumbar spine and when climbing on and off the examination table, though there were no

lumbosacral spasms.  Consistent with a fusion, the doctor found the claimant to have a decreased range of motion of the lumbar spine as well as both hips, though he had a full range of motion of all other joints.  The claimant walked with a slow gait, and he was unable to walk on his toes or heels and he could not stoop.  However, he was able to tandem walk and he did not require any assisting device for ambulation.  Dr. Greenberg found the claimant to have a positive straight leg raise, bilaterally, and decreased left leg strength of 4 out of 5.  The doctor found no other motor, sensory, or reflex abnormalities.  The claimant had normal grip strength and fine manipulation. Dr. Greenberg diagnosed the claimant with severe low back pain probably secondary to lumbar disc disease, aggravated by obesity [Exhibit 16F].

Tr. 37.  The ALJ also considered David Guttman's, M.D.'s, consultative

report when assessing Plaintiff's RFC and in conjunction with her

consideration of treating physician, Dr. Scott's assessment.

Eric W. Scott, M. D., Regularly examine the claimant after he underwent back surgery.  Dr. Scott noted on July 21, 2009, that the claimant had a negative straight leg raise, bilaterally.  The doctor noted that the claimant's lower extremity strength was intact [Exhibit 6F15].  Dr. Scott continued to examine the claimant through April 2010 with stable objective findings [Exhibit 6F].

* * * *

Dr. Scott noted on April 23, 2010, that the claimant underwent a Functional Capacity Evaluation on April 1, 2010.  Dr. Scott observed that the report indicated that the claimant participated with varied effort throughout all areas of the testing.  The doctor noted that the examiner indicated that the claimant would stop before full effort was reached and complained of pain during the test.  The report further found three out of five Waddell signs to be positive, indicating possible malingering on the part of the claimant [Exhibit 5F2].

As for the opinion evidence, David Guttman, M.D., State agency consultant, opined on July 4, 2012, that the claimant was able to

perform light work except he was limited to standing and walking for a total of four hours in an eight-hour workday.  Dr. Guttman also found the claimant limited to pushing and pulling with the left lower extremity.  The doctor found the claimant able to occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs.  The claimant was never able to climb ladders, ropes, or scaffold.  Dr. Guttman found that the claimant should avoid concentrated exposure to extreme cold and heat, vibration, and hazards [Exhibit 2A9-11].  The undersigned accords significant weight to the opinion of Dr. Guttman because it is based upon a review of the medical record and it is consistent with the medical record as a whole.  The record supports a reduction in the claimant's work capacity to a wide range of light work based upon his subjective complaints, treatment history, diagnostic imaging findings, and positive findings upon examination.  However, the claimant is found able to perform a wide range of light work based upon his mild diagnostic findings, primarily negative objective findings upon examination, and wide range of varied activities of daily living, including some day laborer work.  Overall, the medical evidence does not support any further limitations prior to the date last insured.

Dr. Scott opined on April 23, 2010, that the claimant was limited to sedentary work.  The claimant's Functional Capacity Evaluation found him able to tolerate a sedentary physical demand level [Exhibits 8E, 5F, and 20F].  Dr. Wassef limited the claimant to sedentary work on February 9, 2012, based upon the Functional Capacity Evaluation performed on April 1, 2010 [Exhibit 14F8-12].   The opinions of Dr. Scott and Dr. Wassef are given reduced weight because they are inconsistent with the doctors' own examinations of the claimant, showing only limited positive objective findings.  In addition, the doctors' opinions are primarily based upon a Functional Capacity Evaluation that specifically noted that the claimant was not exerting full effort and showed signs of possible malingering with positive Waddell signs.  Overall, the opinion of Dr. Guttman is more consistent with the medical record as a whole and other record evidence that includes a wide range of daily activities involving day laborer and significant church youth ministry activities.

In sum, the above residual functional capacity assessment is due to the claimant's status post laminectomy and fusion at the lumbar spine with residual pain.

Tr. 36-38.

### C.  Medical Evidence

For the most part, the ALJ considered the medical evidence at step four when assessing Plaintiff's RFC, interspersed with consideration of Plaintiff's hearing testimony and State Agency consultant reports.  Tr. 36-39.

### D.  The Vocational Expert's Testimony

The ALJ asked the vocational expert to classify Plaintiff's prior work experience since 1998.  Tr. 114.  These jobs included concrete helper (construction worker II), Dictionary of Occupational Titles (DOT) number 893.687-026, very heavy work, with an SVP of two and unskilled.  As performed, it was consistent with heavy to very heavy work.  Tr. 114-115; *see* Tr. 39.  The second position was described as a warehouse worker, although as he performed it, it was defined by three different job titles in the DOT such as forklift operator, DOT number 921.683-050, medium work, with an SVP of three, semi-skilled, and consistent with medium as performed.  Tr. 115; *see* Tr. 39.  The second portion of that job was described as the "actual warehouse worker" with DOT number 922.687-

058, which is medium work with an SVP of two, unskilled; however, he performed this job at greater than 50 pounds, which would make that heavy work as performed.  *Id.*  The next portion of that overall work title was "delivery driver heavy," DOT number 905.663-014, medium work, with an SVP of four, semi-skilled.  According to the vocational expert, hearing testimony indicated lifting 100 pounds or more is very heavy as performed. *Id.*

The vocational expert testified that the next position Plaintiff performed was that of a janitor, DOT number 381.687-018, and medium work with an SVP of two, unskilled.  Testimony also indicated lifting greater than 50 pounds, which would make that work heavy as performed. Tr. 115-16; *see* Tr. 39.  The next position he performed was that of a "janitor lead, supervisory working janitor position, DOT number 381.137-010," and medium work with an SVP of six, skilled work, 50 pounds or more heavy work as performed.  Tr. 116; *See* Tr. 39.  The vocational expert clarified that based on Plaintiff's testimony, he performed it as skilled work as SVP six.  The vocational expert opined that his performance of the job was consistent with an SVP of four, semi-skilled.  *Id.*  The next position described was that of groundskeeper, DOT number 406.684-014, and medium work with an SVP of three, semi-skilled, with the weight consistent

with medium work as performed.  *Id.*   The last job performed was referred

to a "self-employment piece is that of as a handyman," DOT number

869.381-010, and medium work with an SVP of seven, skilled work, but as

performed, it was probably at an SVP level of four, semi-skilled.  Tr. 116-

17; *see* Tr. 39.

The ALJ asked the vocational expert whether a hypothetical

individual of Plaintiff's age, education, and vocational background, who

could perform light exertion work that did not require standing and walking

more than four hours total in an eight-hour workday, did not require more

than occasional postural functions, but never required climbing ladders,

ropes or scaffolds, and avoided any concentrated exposure to extreme

heat, extreme cold, vibrations or hazards.  Tr. 117-18.  The vocational

expert testified that the hypothetical person would not have any

transferable skills to this RFC and the jobs were "mainly construction

and/or warehouse work."  Tr. 118; *see* Tr. 38.

Notwithstanding, the vocational expert identified several

representative jobs the hypothetical person (Plaintiff) could perform such as

mail clerk, DOT number 209.687-026, and light work with an SVP of two,

unskilled; ticket taker, DOT number 344.667-010, and light work with an

SVP of two, unskilled; and ticket seller, DOT number 211.467-030, and light work with an SVP of two, also unskilled.  Tr. 118; see Tr. 40.

The ALJ provided the vocational expert with a second hypothetical including the limitations in hypothetical one, above, but added the additional limitation that the person would not be required to maintain the position of either sitting or standing for more than 45 to 60 minutes without interruption before they could change position for at least a few minutes. The vocational expert opined that her response would not change but further noted:

> No, Your Honor, and by testimony I can indicate that the positions that I've identified have a sit/stand option, which would accommodate the hypothetical number one, a no standing or walking four hours alternating, and for hypothetical number two, the alternating between 45 and 60 minutes.  The sit/stand option would apply in both situations for your hypothetical.

Tr. 119.  The vocational expert noted in response to a question posed by the ALJ that the sit/stand option is something that is not addressed in the DOT so it is not in conflict with the DOT.  *Id.*  The vocational expert stated that her knowledge of the subject is based on having "worked in the field for over 20 years, meeting with employers, discussing with them the availability of chairs, stools, headsets, and workstations that can be raised and lowered. For the most part, employers have indicated that these

positions would allow a sit/stand option based upon the addition of those particular situations, chairs, stools and headsets." *Id.*

The ALJ asked the vocational expert a third hypothetical and to assume the same limitations from hypotheticals one and two, but added that the person would be limited to sedentary exertion and whether that addition would change her response.  Tr. 120.  The vocational expert identified several sedentary jobs.  Tr. 120-21.

The ALJ asked the vocational expert a fourth hypothetical, which included the limitations in hypotheticals one through three, but added the limitation that the person, in addition to the standard workday breaks, would require an additional 30-minute break time and whether that additional limitation would alter her response to the three hypothetical questions.  Tr. 121.  The vocational expert opined that would change her response and that no competitive work would be available with this limitation.  Tr. 121-22.

In response to questioning by Plaintiff's counsel, the vocational expert also opined that the industry standard has been that an employee may be off task in addition to normally scheduled breaks for no more than fifteen per cent of the workday and that an employee could have no more than two unscheduled absences in a 30-day period.  Tr. 122.  According to the vocational expert, if a person were to miss two or more days a month on a

regular basis, that would be grounds for termination, which would eliminate

competitive employment with that degree of absenteeism.  *Id.*  Further, the

vocational expert testified that if the person needed to lie down periodically

through the day at will, that would not be tolerated in a competitive

employment.  *Id.*

## V.  Legal Analysis

Plaintiff raises two issues for consideration.  First, Plaintiff argues that

the ALJ erred in rejecting the opinions of his treating physicians, Drs. Scott

and Wassef, regarding Plaintiff's physical condition and the ALJ's rejection

of the opinion of Dr. Greenberg, a medical doctor and State agency

consultant, who examined Plaintiff and opined regarding Plaintiff's physical

condition.  Plaintiff also argues that the ALJ erred in not accepting the

opinions of State agency consulting psychologists, Drs. Humphreys and

Beaty, who "found [P]laintiff to be mentally ill."  ECF No. 12 at 7-8.  Second,

Plaintiff argues that the ALJ erred when she rejected Plaintiff's assertion

that "an objectively determined medical condition is of such severity that it

can reasonably be expected to cause the alleged pain" identified by

Plaintiff.  ECF No. 22 at 10.  As a subsidiary argument, Plaintiff argues that

based on the evidence of record, the ALJ erred at step five when she

determined Plaintiff could work, even at the light or sedentary levels.[6]  ECF

No. 22 at 11-14.

### A.  Substantial evidence supports the ALJ's evaluation of the weight given to the opinions of Plaintiff's treating physicians and State agency consultants.

As the finder of fact, the ALJ is charged with the duty to evaluate all

of the medical opinions of the record resolving conflicts that might appear.

20 C.F.R. § 404.1527.  When considering medical opinions, the following

factors apply for determining the weight to give to any medical opinion: (1)

the frequency of examination and the length, nature, extent of the treatment

relationship; (2) the evidence in support of the opinion, that is, "[t]he more a

medical source presents relevant evidence to support an opinion,

particularly medical signs and laboratory findings, the more weight" that

opinion is given; (3) the opinion's consistency with the record as a whole;

(4) whether the opinion is from a specialist and, if it is, it will be accorded

greater weight; and (5) other relevant but unspecified factors.  20 C.F.R.

§ 404.1527(b) & (c).

The opinion of the claimant's treating physician must be accorded

considerable weight by the Commissioner unless good cause is shown to

---

[6]  Based on the vocational expert's testimony, the ALJ determined at step five that Plaintiff could perform several representative jobs at the light exertion level, with an SVP of two (unskilled), not at the sedentary exertion level, Tr. 40, although the vocational expert opined that Plaintiff could perform several sedentary jobs.  Tr. 120.

the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

This is so because treating physicians "are likely to be the medical

professionals most able to provide a detailed, longitudinal picture of your

medical impairment(s) and may bring a unique perspective to the medical

evidence that cannot be obtained from the objective medical findings alone

or from reports of individual examinations, such as consultative

examinations or brief hospitalizations."  20 C.F.R. § 404.1527(c)(2).  "This

requires a relationship of both duration and frequency."  Doyal v. Barnhart,

331 F.3d 758, 762 (10th Cir. 2003).  "'The treating physician doctrine is

based on the assumption that a medical professional *who has dealt with a*

*claimant and his maladies over a long period of time* will have a deeper

insight into the medical condition of the claimant than will a person who has

examined a claimant but once, or who has only seen the claimant's medical

records.'  *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (emphasis

added)."  *Id.*

> As the Supreme Court recently observed, "the assumption that the
> opinions of a treating physician warrant greater credit that [sic] the
> opinions of [other experts] may make scant sense when, for example,
> the relationship between the claimant and the treating physician has
> been of short duration."  *Black & Decker Disability Plan v. Nord*, [538
> U.S. 822, 832 (2003)].  Moreover, a longstanding treatment
> relationship provides some assurance that the opinion has been
> formed for purposes of treatment and not simply to facilitate the
> obtaining of benefits.

A physician's opinion is therefore not entitled to controlling weight on the basis of a fleeting relationship, or merely because the claimant designates the physician as her treating source.  Absent an indication that an examining physician presented "the *only* medical evidence submitted pertaining to the relevant time period," the opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion.  *Reid v. Chater*, 71 F.3d 373, 374 (10th Cir. 1995) (emphasis added).

Doyal, 331 F.3d at 762-63.

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips, 357 F.3d at 1241.  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  MacGregor, 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory.  Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991).  Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so.  Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).  Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a

contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence."  Lewis, 125 F.3d at 1440; Edwards, 937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).  Further, where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's impairments.  Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

The Eleventh Circuit, however, recently upheld an ALJ's ability to discount a psychiatrist's opinion on the basis that the doctor relied heavily on subjective reports of symptoms and limitations provided by the claimant. *See* Lacina v. Comm'r of Soc. Sec., F. App'x 520, 527-28 (11th Cir. 2015) (unpublished).  Consistent with Lacina, here, the ALJ explicitly referenced her credibility findings and questioned the reliability of Plaintiff's subjective reports.  Tr. 36-39.

**Mental Limitations**

At step two, the ALJ determined that Plaintiff had one severe impairment: "status post laminectomy and fusion at the lumbar spine with residual pain."  Tr. 31.  The ALJ also considered Plaintiff's obesity, but found it nonsevere.  Tr. 31-32.  Relevant here, the ALJ also considered Plaintiff's allegation that he is disabled based on mental impairments.  To this end, the ALJ provided a mental functional assessment and considered the opinions of several State agency consultants, such as psychologists, Drs. O'Neil, Wise, Sandrik, Humphreys (examining consultant), Schilling, and Beaty (examining consultant).  Tr. 32.  The ALJ provided an extensive analysis of the weight she afforded their opinions and the opinion of Dr. Wassef, Plaintiff's pain management specialist.  Tr. 33.

Plaintiff relies on the diagnoses of Drs. Humphries and Beaty and suggests that these diagnoses support Plaintiff's claim of disability. ECF No. 12 at 8.  A diagnosis does not establish limitations.  *See* Moore v. Barnhart, 405 F.3d at 1213 n.6.  To qualify as "severe," an impairment must significantly limit the claimant's abilities to do basic work activities for at least 12 consecutive months.  *See* 20 C.F.R. §§ 404.1505(a), 404.1509, 404.1520(a), (c), 404.1521 (a).  Further, the Commissioner will not find

impairment severe unless they significant limit the ability of the claimant to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).

At step two, the ALJ found in Plaintiff's favor (in part) and proceeded with the other steps of the sequential evaluation process.  Tr. 31-35.  Thus, "[e]ven if the ALJ erred in not indicating whether [a condition] was a severe impairment, the error was harmless because the ALJ concluded that [the claimant] had a severe impairment."  Heatly v. Comm'r of Soc. Sec., 382 F. App'x 823, 824-25 (11th Cir. 2010) (citations omitted) (unpublished).  "Nothing requires that the ALJ must identify, at step two, all the requirements that should be considered severe.  Instead, at step three, the ALJ is required to demonstrate that [she] has considered all of the claimant's impairments, whether severe or not, in combination."  *Id.* at 825 (citations omitted).  The ALJ met this requirement.  Tr. 35; *see generally* Wilson v. Barnhart, 284 F.3d 1219, 1224-25 (11th Cir. 2002).

On September 22, 2010, Dr. Humphreys, a psychologist, examined Plaintiff at the request of the Office of Disability Determinations "to rule out disabling psychological condition."  Tr. 407.  Plaintiff provided information regarding his current complaint and history of his present illness.  Tr. 407-08.  Dr. Humphreys made several behavioral observations and considered Plaintiff's mental status.  Tr. 408-09.  Plaintiff's friend drove him to the

examination.  He was a tall, overweight man and was casually dressed.

"No peculiarity of gait or involuntary movement was noted.  He spoke

spontaneously at a normal rate and tone.  He was quite guarded and

expressed concern that the examiner might disclose to others that he hears

voices.  He appeared to be a reliable historian."  Tr. 408.  "His mood was

irritable and depressed; his affect was variable and expressive.  He denied

suicidal/homicidal ideation, intent, and plan."  *Id.*  His thought processes

were logical and goal oriented and he had no peculiarity or bizarreness with

respect to the content of his thought.  *Id.*  "While he reported occasional

hallucinations, he denied any during examination."  *Id.*  His judgment and

insight were rated as good for hypothetical questions.  *Id.*  He was well-

oriented to person and place, although "[h]e missed the date by a day."  *Id.*

"Immediate memory was characterized by the repetition of five digits

forward and four digits backward.  He was able to recall two of three

objects after about five minutes, but could not recall the third even with a

clue.  Remote memory appeared to be intact."  *Id.*  "He was able to name

the current president, the prior president, and the capital of Florida.  He

was unable to name any oceans."  Tr. 409.  "He indicated that he could not

perform serial sevens subtraction or the mental addition of double-digit

numbers.  He was able to perform simple addition and multiplication." *Id*.

"He was unable to give any interpretation of two common sayings." *Id*.

Dr. Humphreys provided a diagnostic impression: "[Plaintiff] reported symptoms consistent with a Bipolar Disorder NOS and Psychotic Disorder NOS.  His mood and anxiety likely impact his perception of pain." *Id*.

Dr. Humphreys' diagnoses included Bipolar Disorder, NOS, Psychotic Disorder, NOS, Pain Disorder Associated with Both Psychological Factors and a General Medical Condition.  *Id*.

Dr. Humphreys concluded her report by stating that Plaintiff "suffers from chronic pain" and, as a prognosis and recommendation, stated that "[h]e may benefit from a pharmacological reevaluation and psychotherapy." *Id.*  Regarding his ability to do work-related activities, Dr. Humphreys opined that his "concentration and memory appeared mildly impaired, which may impact his ability to carry out complex instructions.  His social skills and judgment may be affected by his mood disorder and psychosis." Plaintiff seemed capable of managing his own funds.  *Id*.

The ALJ gave significant weight to the opinion of Dr. Humphreys and concluded that the findings of Dr. Humphreys did "not support more than mild limitations on the basis of the claimant's mental impairments."  Tr. 33; *see* 20 C.F.R. § 404.1527(c).  Substantial evidence supports the ALJ's

decision to assign Dr. Humphreys' opinion, which included consideration of her diagnoses, significant weight.  Tr. 32-33.

Other opinion evidence also supported the ALJ's determination that Plaintiff's mental impairments caused no more than mild limitations. 20 C.F.R. § 404.1527(c)(4).  On May 13, 2010, Dr. Wise, a State agency psychologist, completed a Psychiatric Review Technique (PRT) and opined that Plaintiff's depression, secondary to pain, did not constitute a severe impairment and did not cause more than mild limitations in activities of daily living, social functioning, or concentration, persistence, or pace, or episodes of decompensation.  Tr. 390-93, 400; *see* Tr. 32.  The ALJ accorded significant weight to Dr. Wise's opinion.  Tr. 33.

On October 11, 2010, Dr. Sandrik, a State agency psychologist, completed a PRT and opined that Plaintiff did not have a severe mental impairment.  Tr. 479-91; *see* Tr. 491 (consultant's notes).  The ALJ also accorded significant weight to Dr. Sandrik's opinion.  Tr. 33.

On reconsideration of Plaintiff's claim, on June 30, 2012, State agency psychologist, Dr. O'Neil, reviewed the evidence and opined there was insufficient evidence to substantiate the presence of an affective disorder and no indication of a severe mental impairment.  Tr. 146-48.  The ALJ considered Dr. O'Neil's opinion and accorded it significant weight.

Tr. 32-33.

On March 15, 2012, Dr. Beaty, a psychologist and State agency consultant, evaluated Plaintiff.  Tr. 449-51.  "[Plaintiff] drove himself to the interview.  His hygiene appeared to be good, he was casually but appropriately dressed.  There were no obvious appearances of being handicapped.  There were no involuntary movements.  He walked with a normal gait."  Tr. 449.  Dr. Beaty recorded a history.  Tr. 449-50.  Plaintiff's mood was depressed and his affect was sad, constricted, and flat.  Tr. 450.  His orientation was okay as to person, place, time, date, reason for coming to the evaluation, and he could name the current President and two immediate predecessors.  *Id*.  He spoke with normal syntax and his thought process was intact and organized and there were no delusions or paranoia exhibited, appropriate to topics discussed regarding his thought content.  *Id.*  Regarding cognition, he was responsive verbally, alert, had poor insight and extractive ability (he was able to correctly interpret zero of three proverbs presented to him) and he had an average cognitive ability.  *Id.*  He was able to recall six digits forward and three digits backwards and recalled one of three words after five minutes and his history was fairly detailed.  *Id*.  He had no history or observed hallucinations and perceptual disturbances and no reported or history of homicidal or suicidal ideation.  He had no

extraneous motions.  *Id.*  Regarding interaction, he was pleasant but very somber, cooperative, answered questions readily and elaborated on some answers and had good eye contact.  Tr. 451.  In summary, Dr. Beaty noted that Plaintiff "presents with history of injury to discs in lower back and has significant pain and limited range of activities and motion.  Depression is secondary to his pain and loss of range of activities, income, and ability to work."  *Id.*

"Based on information provided by client, records and interview," Dr. Beaty diagnosed Plaintiff with Major Depressive Disorder, severe without psychotic features; Antisocial Personality disorder; and then stated regarding Axis III

> Due to his back injury 10/2008m [sic] he cannot lift over ten pounds, no bending or twisting, and cannot sit in a hard chair more than 30 minutes.  Left leg has nerve damage from injury to knee and ankle at age 12, leg goes numb intermittently.  Needs dental work.  Numbness in hands intermittently.  Blood pressure fluctuates.  Obesity, has gained 90 pounds since 2009 due to inactivity.  High cholesterol.

Tr. 451.  Regarding Axis IV, Dr. Beaty noted: "Problems with education, housing, occupation, economic, access to health care services, interaction with legal system/crime."  *Id.*  Dr. Beaty assigned Plaintiff a GAF score of

50 and his prognosis was guarded.[7]  *Id.*  Dr. Beaty also provided a

statement as to Plaintiff's ability to do work-related tasks.  Tr. 451.

   The ALJ considered Dr. Beaty's opinion and substantial evidence

supports her decision to assign it "little weight."  Tr. 33-34.  As the ALJ

noted, Dr. Beaty relied on Plaintiff's self-reports and not objective

observations or findings in assigning work-related limitations and further

---

   [7]  The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the GAF Scale that is primarily used by mental health practitioners.  The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure."  DSM-IV-TR 32-34.  The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale.  *Id.  See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale).  A score of 31-40 is defined as manifesting "[s]ome impairment in realty testing or communication (e.g., speech is at times illogical, obscure, or irrelevant)" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  DSM-IV-TR at 34.  A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning.  *Id.*  A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*  A GAF scale rating of 61 to 70 indicates some *mild* symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.  *Id.*  The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"  Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).  In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.  In order to provide a global measure of disability, the WHO DSM-5 (*see* the chapter "Assessment Measures")."  DSM-5 at 16; *see* Finley v. Colvin, Civil Action No. 3:12-7908, 2013 WL 6384355, at *23 n.9 (S.D. W.Va. Dec. 5, 2013) ("It should be noted that in the latest edition of the [DSM], the GAF scale was abandoned as a measurement tool.").

that Dr. Beaty's examination findings did not support more than mild

limitations due to a mental impairment.  Tr. 33, 450-51.  Dr. Beaty's

diagnoses were based on information provided by Plaintiff, records, and the

interview.  Dr. Beaty did not identify any specific medical records that he

consulted.  Tr. 449-51.  The ALJ further stated:

> The undersigned's assessment of the medical opinions is supported
> by the medical evidence.  First, the record does not contain any
> treatment notes from a mental health professional.  Second, although
> the claimant alleges receiving medication treatment for his
> depression from Youssef W. Wassef, M.D., his pain management
> specialist, Dr. Wassef informed that the medication was not provided
> to treat a mental impairment.  In fact, the claimant informed
> Dr. Wassef, on December 7, 2009, that he denied feeling depressed
> and he further reported that he had been managing his depression
> with meditation and prayer [Exhibit 4F38].  Also, Dr. Wassef filled out
> Supplemental Mental Impairment Questionnaires about the claimant
> on September 24, 2010 and again on February 9, 2012.
> Dr. Wassef noted that he did not feel that the claimant suffered from a
> mental impairment that significantly interfered with daily functioning.
> The doctor also informed that he had not prescribed any medication
> to the claimant for a mental impairment [Exhibits 11F1 and 13F].[8]
> Furthermore, the findings from the evaluations of Dr. Humphreys and
> Dr. Beaty do not support more than mild limitations on the basis of
> the claimant's mental impairments.  Dr. Humphreys noted that the
> claimant exhibited no involuntary movements.  The doctor observed
> that the claimant spoke spontaneously at a normal rate and tone.
> The claimant denied suicidal and homicidal ideation, intent, and plan.
> Dr. Humphreys found the claimant's thought processes to be logical
> and goal oriented and his thought content to be unremarkable. The
> doctor found the claimant's judgment and insight to be good for
> hypothetical situations.  The claimant was able to perform simple

---

[8]  On March 29 and September 24, 2010, and February 9, 2012, Dr. Wassef did
not feel that Plaintiff suffered from a mental impairment that significantly interfered with
his daily functioning and further that no medication had been prescribed for a mental
impairment.  Tr. 300, 420, 424.

addition and multiplication [Exhibit 9F].  Dr. Beaty observed that the claimant drove himself to the interview, had good hygiene, and was casually and appropriately dressed.  The doctor noted that the claimant walked with a normal gait and had no involuntary movements.  Dr. Beaty found the claimant to be oriented.  The doctor found the claimant's thought processes to be intact and organized and his thought content to be devoid of delusions or paranoia and appropriate to topics discussed.  Dr. Beaty's testing of the claimant's attention and memory was generally unremarkable.  The doctor estimated the claimant's cognitive ability to be average [Exhibit 17F].

Tr. 33.

Furthermore, Plaintiff's self-reported activities provide substantial evidence to support the ALJ's evaluation of the opinion evidence and conclusion that Plaintiff did not have more than mild limitations due to a mental impairment.  20 C.F.R. § 404.1527(c)(6).  Plaintiff reportedly cared for his family; went out daily; and could walk, drive, go out alone, shop in stores for food, and manage his finances.  Tr. 34, 243, 245.  He read and watched television, attended church functions three times a week, and assisted with his church youth group.  Tr. 34, 108, 246.  He reportedly had no difficulty with memory, completing tasks, concentration, understanding, following instructions, or getting along with others.  Tr. 34, 247-48.  The performance of these activities is consistent with Dr. Humphreys' opinion that Plaintiff's "concentration and memory appeared mildly impaired, which may impact his ability to carry out complex instructions," although "[h]is

social skills and judgment may be affected by his mood disorder and psychosis," Tr. 409, factors considered by the ALJ.  Tr. 32.

Substantial evidence supports the ALJ's evaluation of the State agency consultants' opinions, including those of Drs. Humphreys and Beaty.

### Physical Limitations

Plaintiff argues that the ALJ erred in not giving proper weight to the opinions of Plaintiff's treating physicians, Drs. Scott and Wassef, and the opinion of State agency consultant, Dr. Greenberg, regarding Plaintiff's physical limitations.  ECF No. 12 at 7-8.  The ALJ considered and discussed at length the records provided by these medical sources. Tr. 36-39.  Substantial evidence supports the ALJ's consideration of their opinions.

On October 20, 2008, Plaintiff's alleged onset date, Plaintiff injured his back while moving a concrete slab.  Tr. 278, 283.  Lumbar spine imaging showed a disc bulge at L4-L5 and left paramedian disc herniation at L5-S1, displacing the left S1 nerve root; some disc bulging, and crowding of the cauda equina.  Tr. 275-87, 290-91, 382, 389.  Subsequently, Plaintiff experienced back pain and bilateral lower extremity radiculopathy, but he

obtained some relief from pain medication and epidural steroid injections. Tr. 278, 287.

From January 2009 through April 2010, Plaintiff treated with neurosurgeon, Dr. Scott.  Tr. 354-88.  On January 9, 2009, Plaintiff had his first neurological consultation with Dr. Scott.   Tr. 36-87.  He walked slowly, but he showed no sign of acute distress.  Tr. 387.  He had positive straight leg raise tests and diminished range of motion with back and right leg pain, but good distal pulses, full-strength throughout (5/5), intact cranial nerves and sensation, and slightly diminished reflexes.  *Id.*  Dr. Scott prescribed pain medication and recommended vertebral axial distraction (VAX-D). Tr. 388.  In February and March 2009, Plaintiff underwent a full course of VAX-D with limited success.  Tr. 384-85.

In April 2009, Plaintiff showed no sign of acute distress after examination.  Tr. 278-79.  He had no tenderness at the back; no cyanosis, clubbing or edema of the extremities; grossly intact cranial nerve; and normal motor function, reflexes and pulses.  Tr. 279.

In May 2009, he had elective surgery.  Dr. Scott performed an elective laminectomy with discectomy at L4-L5 and L5-S1 and posterior interbody fusion, cages and bore morphogenic protein of L5-S1.  Tr. 285, 375-77.  Dr. Scott assessed "severe stenosis secondary to facet

enteropathy and hypertrophic ligament[,] a congenitally narrow canal, and left-cited paracentral HNP L5-S1." Tr. 287. Plaintiff tolerated the procedure well, Tr. 291, 374, and continued doing well after surgery. Tr. 373-74.

The ALJ noted that Dr. Scott subsequent treatment notes did not support greater restrictions than those included within her physical RFC finding. Tr. 39. During examinations from June through December 2009, Plaintiff had some back pain, but nearly always intact strength throughout. Tr. 360, 366, 368, 371, 373. Objective imaging indicated stable findings until December 2009 and, at that time, lumbar stenosis at L3-4 with no need for surgery. Tr. 358, 363-65, 369, 372. Dr. Scott prescribed a spine stimulator, instructed Plaintiff to use a brace one out of bed, and recommended physical therapy. Tr. 373. In July 2009, Plaintiff was participating in aquatic therapy without difficulty. Tr. 371. In August 2009, Dr. Scott recommended a gradual cessation of the brace and continued physical therapy. Tr. 368.

In September 2009, Plaintiff reported pain, but improved flexibility and strength with physical therapy. Tr. 367. Dr. Scott adhered to his earlier recommendations and referred Plaintiff for a weight loss program and

prescribed pain medication.  Tr. 367.  In October 2009, Dr. Scott noted a

thirty-five pound weight gain since surgery and referred Plaintiff to

Dr. Wassef for pain management and continued Plaintiff on pain

medication.  Tr. 360, 366.  By December 2009, Plaintiff continued to have

back issues; some numbness in his right foot; and discomfort in the

buttock.  Tr. 360.

At his next appointment in March 2010, Plaintiff reported back pain,

but his fusion appeared stable and additional decompensation was not

indicated.  Plaintiff had no abnormal motion on flexion extension.  Tr. 358-

59.  Dr. Scott noted Plaintiff's physical therapist had discharged him for

noncompliance.  Tr. 359.  Dr. Scott opined that Plaintiff had reached

maximum medical improvement and assigned a permanent impairment

rating of fourteen percent.  *Id.*  Care was transferred to Dr. Wassef.  *Id.*

The record indicates that Plaintiff benefited from conservative

treatment modalities, even after he did not comply with physical therapy

and prescribed weight loss.  *See* 20 C.F.R. § 404.1530(b).

On April 1, 2010, physical therapist Jane A. Sauer, M.P.T., performed

a Functional Capacity Evaluation (FCE).  Tr. 466-73.  On exam, Plaintiff

demonstrated no range of motion or strength deficits, fair posture, good

balance, and normal sensation.  Tr. 469, 471, 473.  Ms. Sauer noted

Plaintiff was positive for three of five Waddell's Nonorganic Signs,

indicating a bio-behavioral aspect of pain and possible malingering, a point

noted by the ALJ.  Tr. 38, 470.  Ms. Sauer further noted Plaintiff

"participated with varied effort throughout all areas of testing" and yet

limited Plaintiff to lifting ten pounds occasionally.  Tr. 466, 473.  Based on

his performance, Ms. Sauer also limited Plaintiff to sedentary work and

specified he could frequently sit, stand, and grasp bilaterally and

occasionally perform all other work tasks.  Tr. 466.

On April 23, 2010, Dr. Scott noted that Plaintiff underwent an FCE

performed by Ms. Sauer, Tr. 466-73, and he opined that Plaintiff could

perform the demands of permanent sedentary work.  Tr. 354-57; *see*

Tr. 38.

On August 11, 2010, three months after his April 2010 opinion,

Dr. Scott completed a treating source neurological questionnaire and

indicated Plaintiff had no positive neurological symptoms related to his

post-laminectomy syndrome, maintained full grip and lower extremity

strength (5/5) throughout, and did not require an assistive device.  Tr. 405.

As the ALJ appropriately concluded, Dr. Scott's treatment notes do not

support his April 2010 restriction to sedentary work.  Tr. 39.

Similarly, Dr. Wassef's treatment notes did not support his February 9, 2012, opinion limiting Plaintiff to sedentary work.  Tr. 435-36.  At the request of Dr. Scott, Dr. Wassef first examined Plaintiff on December 7, 2009, due to low back pain radiating down Plaintiff's left side and numbness in his right foot.  Tr. 330, 336.  At that time, Tr. 339, and at examinations thereafter, Plaintiff comfortably sat, stood, and walked without an assistive device.  Tr. 305, 315, 320, 325, 332, 428, 434.  He had decreased range of motion with pain and tenderness for the lumbar spine, but full range of motion for all extremities, full strength and muscle tone throughout, and normal reflexes and gait.  Tr. 306, 311-12, 316, 321, 325-26, 332-33, 339-40.  Plaintiff reported medication relieved his pain symptoms at times -- ranging from zero to as much as seventy percent on February 23, 2010, Tr. 309.  Tr. 304, 309, 314, 319, 324, 331, 337-38; *see* Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996).

By January and February 2010, Plaintiff desired to see if he could return to work with pain medication only and he refused a spinal cord stimulator.  Tr. 303, 308, 313.  By March 2010, Plaintiff reported his pain got worse when walking and standing for long and also when bending and lifting.  Tr. 304.  He reported that his pain was better with rest and medication.  *Id.*

Plaintiff followed up with Dr. Wassef on February 9 and March 2, 2012.  Tr. 426-38.  During his March 2012 examination, Plaintiff reported that he continued with pain, but he wanted to deal with his pain without using Oxycodone.  Tr. 426.  He took Meloxicam as needed and Medrox daily.  *Id.*  Plaintiff was reported being awake, alert, and in no acute distress.  Tr. 428.  He was comfortable sitting, standing, and during ambulation and needed no assistance for all transfer and was not using assistive devices.  *Id.*  His upper and lower extremity examination revealed full range of motion bilaterally and strength was normal bilaterally.   Tr. 428-29.  Plaintiff had some limitation of lumbar forward flexion secondary to stiffness.  Tr. 429.  His higher cortical function was normal.  His muscle tone was normal for his upper and lower extremities.  His deep tendon reflexes were normal.  *Id.*  Dr. Wassef restated Plaintiff's functional status by referring to the FCE done on April 1, 2010.  *Id.*  Medications were prescribed, including Oxycodone with no refills.  Tr. 430.

Lumbar imaging of March 14, 2012, showed an intact posterior spinal fusion.  It is noted: "[a]lignment is anatomic.  No disk space narrowing is seen.  On the AP view there is very minimal scoliosis present.  The pedicles are all intact."  Tr. 443.  Imaging of Plaintiff's lumbar spine on July 15, 2013, provided the following impression: posterior lumbar spinal fusion

from L4-S1 without evidence of hardware loosening or hardware fracture; mild disc height loss at L3-4 with posterior end plate spurring; and no evidence of acute fracture or subluxation involving the lumbar spine. Tr. 476; *see* Tr. 37.

Having considered the treatment notes and opinions of Drs. Scott and Wassef, the ALJ determined that "[t]he opinions of Dr. Scott and Dr. Wassef are given reduced weight because they are inconsistent with the doctors' own examinations of the claimant, showing only limited positive objective findings.  In addition, the doctors' opinions are primarily based upon a Functional Capacity Evaluation that specifically noted that the claimant was not exerting full effort and showed signs of possible malingering with positive Waddell signs."  *Id.; see* Tr. 466, 470.

Although not an issue for the Court's determination, the ALJ did not specify the weight she assigned to Dr. Greenberg's opinion.  Tr. 37-39, 447.  Nevertheless, the ALJ summarized Dr. Greenberg's evaluation when formulating her RFC finding and also properly evaluated his opinion. Tr. 444-47.  In March 2012, months after Plaintiff's date last insured, Dr. Greenberg noted Plaintiff had lumbar pain while climbing on and off the examination table, positive straight leg raise test bilaterally, decreased range of motion with pain from the lumbar spine and both hips, and 4/5

strength for the left leg.  Tr. 444-47.  On the other hand, Plaintiff had full range of motion for all other joints and no other sensory, motor, or reflex abnormalities and could walk without assistance.  Tr. 445-46.

Dr. Greenberg assessed severe low back pain, probably secondary to lumbar disc disease, aggravated by obesity.  Tr. 445.  Dr. Greenberg did not specify any limitation on Plaintiff's ability to work.  Tr. 444-46.

Notwithstanding, the ALJ's evaluation of the opinion evidence in her RFC finding for light work is further supported by other opinion evidence. In July 2012, State agency neurologist, Dr. Guttman, reviewed all the relevant medical evidence and opined Plaintiff could perform the demands of light work, except that he could stand and walk four of eight hours. Tr. 149.  Dr. Guttman further indicated Plaintiff had limited ability to push and pull with the left lower extremity: could occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs; could never climb ladders, ropes, or scaffold; and had to avoid concentrated exposure to temperature extremes, vibration, and hazards.  Tr. 149-51.  The ALJ assigned Dr. Guttman's opinion significant weight "because it is based upon a review of the medical record and it is consistent with the medical record as a whole" and further determined that his opinion "is more consistent" with other record evidence that includes a wide range of daily activities involving

day labor and significant church youth ministry activities." Tr. 38-39.

Plaintiff does not challenge the ALJ's evaluation of his opinion. ECF No.

12.

Additionally, Plaintiff's most recent lumbar imaging, dated July 15,

2013, further supports the ALJ's evaluation of the opinion evidence and her

RFC finding of a reduced range of light work. Tr. 37. The imaging showed

mild disc height loss at L3-4 with posterior and plate spurring, but no

evidence of hardware loosening and no evidence of fracture or subluxation

involving the lumbar spine. Tr. 476.

Finally, Plaintiff's testimony and self-reported activities provide

substantial evidence supporting the ALJ's evaluation of the opinion

evidence and physical RFC finding. Plaintiff testified that since 2008 he

had looked for physically demanding work and performed side work as a

day laborer. Tr. 94-97. During a face-to-face interview in February 2012,

Plaintiff did not appear to be in pain and sat for an hour without standing.

Tr. 223. Six months later, he reported that he cared for his family; went

outside daily; attended church multiple times a week; and could walk, drive,

go out alone, shop in stores for food, and manage his finances. Tr. 243,

245-46. Plaintiff's self-reported activities, when viewed in conjunction with

the examination findings of Drs. Scott and Wassef, Dr. Guttman's opinion,

and imaging of record, provide substantial evidence to support the ALJ's evaluation of the opinion evidence and ultimate RFC finding for a range of light work.

The ALJ is charged with weighing the evidence and the Court may not reweigh the evidence or substitute its own judgment for that of the Commissioner even if it finds the evidence preponderates against the Commissioner's decision.  Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005).  This Court should not reweigh the evidence and substitute its judgment for the ALJ's judgment.

### B. Substantial evidence supports the ALJ's credibility determinations.

Plaintiff argues that the ALJ's credibility analysis of Plaintiff is not supported by substantial evidence.  ECF No. 12 at 10-14.  This argument also lacks merit and should be rejected because substantial evidence supports the ALJ's credibility findings.

The credibility of the claimant's testimony must be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain.  Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988).  After considering a claimant's complaints of pain, an ALJ may reject them as not credible.  See Marbury, 957 F.2d at 839 (citing Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984)).  If an

ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's credibility.  *See* Wilson v. Barnhart, 284 F.3d 1225.  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.  *Id.*

A claimant's description of his impairment and symptoms, standing alone, is insufficient to establish a disability.  20 C.F.R. §§ 404.1528(a), 404.1529(a).  Subjective symptoms can be overstated, so a claimant's subjective allegations of pain or other symptoms alone will not establish that he is disabled.  42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529(a).

Pain is subjectively experienced by the claimant, but that does not mean that only a mental health professional may express an opinion as to the effects of pain.  One begins with the familiar way that subjective complaints of pain are evaluated:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

Wilson, 284 F.3d at 1225.  *See* 20 C.F.R §§ 404.1529 (explaining how symptoms and pain are evaluated); 404.1545(e) (regarding RFC, total limiting effects).[9]

An ALJ may credit subjective pain testimony even if objective evidence is lacking.  But this is merely permissive guidance.  It does not mandate belief in the subjective testimony where the substantial evidence in the record indicates otherwise.  After all, in making the credibility finding, the ALJ is directed to articulate the findings based upon substantial evidence.  Substantial evidence may consist of objective medical findings, a lack of other objective medical findings, evidence of exaggeration, inconsistencies in activities of daily living, failure to pursue recommended physical therapy or to take prescribed medications, and the like.

Here, the ALJ considered the evidence and found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with the RFC of a limited range of light work.  Tr. 38.

---

[9]  Although the ALJ did not expressly refer to the three-part part standard, it is clear that the ALJ's findings, discussion, and citation to 20 C.F.R. § 404.1529, Tr. 35, indicate that the pain standard was applied.  Wilson, 284 F.3d at 1226.

The ALJ found Plaintiff's statements concerning the intensity, persistence, limiting effects symptoms were not credible to the extent they conflicted with her RFC assessment for a reduced range of light work. Tr. 38-39. The ALJ discussed Plaintiff's function reports indicating a wide range of recreational activities. Tr. 38, 242-48. In assessing Plaintiff's credibility, the ALJ appropriately considered Plaintiff's activities of daily living. Tr. 34, 38.[10] She also considered his testimony in which he indicated he looked for heavy or medium exertion, construction and warehouse jobs in 2008 and held himself out as ready, willing, and able to work. Tr. 29, 94-97. The ALJ noted Dr. Wassef's March 2010 treatment notes indicating that Plaintiff refused treatment with a spinal cord stimulator and testimony of his preference for living with any pain medication side effects, suggesting his pain was not as severe as he alleged. Tr. 38, 104, 303, 308. The ALJ referred to Dr. Scott's April 2010 treatment notes in which Dr. Scott noted Plaintiff's FCE results and, particularly, that Plaintiff participated with varied degrees of effort and test results provided positive indications of malingering. Tr. 38, 354.

---

[10] The ALJ may consider a claimant's daily activities when evaluating subjective complaints of disabling pain and other symptoms. Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i). *But see* Lewis v. Callahan, 125 F.3d at 1441 ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability).

The ALJ further relied on Dr. Guttman's July 2012 opinion indicating Plaintiff could perform a range of light work.  Tr. 38, 149-50.  As noted above, the ALJ assigned Dr. Guttman's opinion significant weight because it was consistent with the medical record as a whole.  Tr. 38.

Substantial evidence supports the ALJ's credibility determinations. *See* Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) ("A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court.").  Plaintiff's argument on this point should be rejected.

## VI. Conclusion

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly applied the law.  Accordingly, it is respectfully recommended that the decision of the

Commissioner to deny Plaintiff's application for Social Security benefits be

**AFFIRMED.**

**IN CHAMBERS** at Tallahassee, Florida, on December 14, 2015.

s/ Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**